IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

IN RE TROPICANA                        :      Chapter 11
ENTERTAINMENT, LLC, *et al.*,          :      Bankr. No. 08-10856 (MFW)
                                       :      (Jointly Administered)
                 Debtors.              :

---

LIGHTSWAY LITIGATION SERVICES,         :
LLC, as Trustee of the Tropicana Litigation   :
Trust,                                 :      Adv. No. 10-50289 (MFW)
                 Appellant,            :
          v.                           :
                                       :
WILLIAM J. YUNG, III, WIMAR TAHOE      :
CORPORATION and COLUMBIA              :
SUSSEX CORPORATION,                   :      Civ. No. 23-959-CFC
                                       :
                 Appellees.            :

---

Kevin S. Mann, CROSS & SIMON, LLC, Wilmington, Delaware; Herbert Beigel,
LAW OFFICES OF HERBERT BEIGEL, Tucson, Arizona,

     *Counsel for Appellant*

Dennis A. Meloro, GREENBERG TRAURIG, LLP, Wilmington, Delaware;
George M. Vinci, Jr., Neal R. Troum, SPECTOR GADON ROSEN VINCI P.C.,
Philadelphia, Pennsylvania,

     *Counsel for Appellees*

## **OPINION**

December 3, 2024
Wilmington, Delaware

*Col F. C*

COLM F. CONNOLLY
CHIEF JUDGE

This appeal arises in the chapter 11 cases of debtor Tropicana Entertainment, LLC and certain affiliates ("Debtors") with respect to a judgment entered by the Bankruptcy Court in an adversary proceeding brought by Lightsway Litigation Services, LLC ("Lightsway"), as trustee of the litigation trust established pursuant to the confirmed plan, against Wimar Tahoe Corporation ("Wimar") and Columbia Sussex Corporation ("CSC") (collectively, the "Defendants"). Following pretrial decisions which narrowed the scope of Lightsway's complaint, a ten-day trial was held on the remaining claims for breach of contract and breach of the covenant of good faith and fair dealing. The Bankruptcy Court ultimately concluded that Lightsway "failed to prove its claims (or damages)." Adv. D.I. 348 at 1-2.

Before me is Lightsway's appeal of the Bankruptcy Court's Order, dated August 17, 2023 (Adv. D.I. 347),[1] as amended on August 21, 2023 (Adv. D.I. 349) (the "Order"), which entered judgment in favor of Defendants for the reasons set forth in the Bankruptcy Court's accompanying amended opinion (Adv. D.I. 348) (the "Opinion"). According to Lightsway, a prior decision by the New Jersey

---

[1] The docket of the adversary proceeding is cited herein as "Adv. D.I. __," and the docket of the chapter 11 cases is cited herein as "Bankr. D.I. __." The supplemental appendix (D.I. 25) filed in support of Defendants' answering brief is cited herein as "SA__."

Casino Control Commission, which denied Wimar a plenary casino license with respect to the Tropicana Atlantic City casino, should have been given preclusive effect as collateral estoppel in this matter. Lightsway further argues that the Bankruptcy Court committed reversible error in its determination that Lightsway did not meet its burden in establishing damages at trial. For the reasons set forth herein, I will affirm the Order.

## I.    BACKGROUND

### A.    The Parties and the Service Contracts

William J. Yung, III, founded CSC in 1972. Adv. D.I. 281 (Joint Stipulation of Facts) at ¶ 6. Over the next twenty years, CSC acquired a portfolio of more than 70 hotels. *Id.* In 1990, Mr. Yung created Wimar to purchase and operate casino properties, which by 2006 totaled seven. *Id.* at ¶ 7. On January 3, 2007, Wimar acquired all the outstanding stock of Aztar Corporation ("Aztar") for approximately $2.1 billion. *Id.* at ¶ 8.

Following the acquisition, each of the casino and hotel entities acquired from Aztar entered into separate service agreements (the "Service Contracts") with Wimar and CSC. *Id.* at ¶¶ 11 & 12. Wimar operated the casinos, and CSC managed the adjoining hotels; CSC was not involved in the day-to-day management of the casinos or responsible for casino licensure or regulation. *Id.*

Lightsway's claims at trial were based entirely on duties allegedly arising

from the eight Service Contracts. The four Service Contracts involving Wimar stated that Wimar would provide "any and all services in casino management matters . . . in connection with [the] various casino operations," along with "other services of a supervisory nature in the casino operations." SA1700-1712. Wimar's duties under the Service Contracts included general casino supervision, including employment, staffing, payroll, marketing, casino layout, casino operations, gaming equipment, and regulatory oversight/compliance. SA1705. The duties outlined in the CSC Service Contracts for the hotels were of a supervisory nature, including employment, purchasing, sales and marketing, accounts receivable, billings, collections, general ledgers, financial statements, vendor invoices, accounts payable, payroll processing, and bank accounts. SA1741.

Wimar began operating the Tropicana Atlantic City casino ("Trop AC") on January 3, 2007, after it was granted an interim casino license in the summer of 2006. Wimar sought the renewal of Trop AC's casino license and issuance of a plenary casino license. Adv. D.I. 281 at ¶ 16. The Division of Gaming Enforcement (the "DGE") investigated and, on October 30, 2007, recommended approving the renewal and issuance of a plenary (*i.e.*, non-interim) casino license subject to certain conditions. *Id.* at ¶ 17. On December 12, 2007, after eight days of hearings, the New Jersey Casino Control Commission (the "CCC") issued an opinion ("CCC Opinion") denying the renewal of Trop AC's license and issuance of

a plenary license.[2]  *Id.* at ¶ 18.  The CCC's denial is central to Lightsway's claims.

## B.    The Debtors and the Adversary Proceeding

Five months later, on May 5, 2008, the Debtors filed voluntary petitions under

chapter 11 of the Bankruptcy Code.  Adv. D.I. 281 at ¶ 3.  The Debtors owned

hotels and casinos located in Nevada, Mississippi, New Jersey, Indiana, and

Louisiana.  Mr. Yung was the director, chief executive, and 100% owner of the

Debtors' ultimate parent company, Tropicana Casino and Resorts, Inc.  On May 5,

2009, the Bankruptcy Court confirmed a plan of reorganization (Bankr. D.I. 1995,

2001).  The plan created a litigation trust to pursue certain insider causes of action

for the benefit of unsecured creditors.  Bankr. D.I. 1995, Art. IV.B.5.

On February 17, 2010, Lightsway filed the complaint against Mr. Yung,

Wimar, CSC, and others asserting claims for breach of fiduciary obligations, breach

of contract, breach of the implied covenant of good faith and fair dealing, and

equitable subordination.  After decisions on two motions to dismiss and a motion for

summary judgment, two claims remained against Wimar and CSC: (1) breach of

contract and (2) breach of the covenant of good faith and fair dealing.  Those claims

are based on the four Service Contracts between Wimar and the Debtors for casino

management services and the four Service Contracts between CSC and the Debtors

---

[2] The CCC Opinion is attached to Lightsway's opening brief.  D.I. 18-1.  The CCC decision was appealed and affirmed.  *In re Adamar of New Jersey, Inc.*, 401 N.J. Super. 247, 251 (N.J. Super. Ct. App. Div.), *aff'd*, 197 N.J. 179, 180 (N.J. 2008).

for hotel management and back-office functions.

### C.    The Trial

The Bankruptcy Court held a ten-day trial on the remaining claims in October, November, and December, 2022. Lightsway's argument at trial was that Wimar's failure to obtain a casino license for Trop AC in and of itself established liability. The Bankruptcy Court had ruled, prior to trial, that the evidence presented at the CCC proceeding and the CCC Opinion denying Wimar a casino license would be admissible at trial. Adv. D.I. 245. And at trial, Lightsway relied almost exclusively on the CCC proceedings and the CCC Opinion in support of its claims. As the Bankruptcy Court noted, Lightsway's trial strategy was to "offer[] into evidence much of the testimony and exhibits which were presented before the CCC which it contends proves the Defendants' mismanagement of Trop AC." Op. at 22. "Specifically, [Lightsway] presented evidence that the license application was denied by the CCC because Defendants (1) had failed to form an independent audit committee as required by casino regulations and (2) had made excessive layoffs resulting in diminished services and security." *Id.* at 22-23.

#### 1.    The Liability Ruling

##### a.    Evidence Regarding the Audit Committee

The Opinion evaluates the evidence presented by Lightsway at trial, as well as the contrary evidence presented by Defendants. The Opinion notes Lightsway's

reliance on the CCC's conclusion "that the Defendants failed to create an independent audit committee for Trop AC as required by law." *Id.* at 23. The Bankruptcy Court considered Defendants' competing "evidence of the extensive efforts of Trop AC's management and counsel to form an audit committee satisfactory to the regulators." *Id.* at 22-23. This included, among other things, evidence that New Jersey gaming regulations do not provide a drop-dead date for when a casino must have an audit committee in place (Op. at 26 n. 75) and the extensive back-and-forth between Trop AC and the regulators relating to Wimar's efforts to form the Trop AC audit committee.[3] The evidence also included the undisputed testimony of Guy Michael, a Wimar attorney who was a former New Jersey casino regulator and one of the authors of the New Jersey Casino Control Act and its implementing regulations (Op. at 25 n.72). During his testimony, Michael "described Trop AC's frequent and close contact with the regulators in 2006 and

---

[3] *See* SA1235:2-7 ("They hired ... a well-respected regulator from another state to be their in-house ... counsel and to help lead them through the process. And then, they hired three of the most well-respected attorneys, regulatory attorneys, in New Jersey."); SA673:3-5 ("[I]t was just ongoing discussions to make sure that what we came up with was a structure that was acceptable to New Jersey"); SA1234:11-19, SA1319-1323 (Mr. Michael, Trop AC's outside counsel, described Trop AC's frequent and close contact with the regulators in 2006 and 2007 concerning the formation of the audit committee); SA1603-1612 (Ms. More, Trop AC's in-house counsel, testified about the extensive communications between Trop AC attorneys and the regulators and stated that Wimar had no intent to avoid or delay forming an audit committee).

2007 concerning the formation of the audit committee." *Id.* at 24 n.70.

Ultimately, the Bankruptcy Court "found the testimony of the Defendants' witnesses on this point to be credible," especially "regarding the diligent efforts made by the Defendants on behalf of Trop AC to get the regulators' approval of the audit committee," which the Bankruptcy Court found "most persuasive." *Id.* at 25. The Bankruptcy Court further found that "[t]his testimony was not contradicted by any credible evidence presented by the Plaintiff." *Id.* at 26. "[B]ased on the testimony and evidence offered by both parties in support of their positions," the Bankruptcy Court found "that the Defendants acted reasonably in their efforts to create an independent audit committee." *Id.* at 26. And based on this finding, the Bankruptcy Court said it "cannot conclude that the manner in which the Defendants acted to form an independent audit committee was a breach of their Service Contracts." *Id.* at 28.

### b. Evidence Regarding Staff Reductions

With respect to staff reductions at Trop AC—another basis on which the CCC denied Wimar a plenary casino license—the Opinion weighs the evidence presented by both parties. Lightsway contended that "Defendants were responsible for the loss of Trop AC's casino license in large part because of excessive layoffs of personnel," since "the CCC had concluded that those layoffs resulted in substantially reduced services to the public and in certain instances violated the

gaming regulations." Op. at 28-29. The Bankruptcy Court also heard extensive evidence, however, that Trop AC was heavily overstaffed when Wimar began operation of the casino in 2007 and desperately in need of right-sizing.[4] The evidence adduced at trial included the undisputed testimony of Defendant's casino management expert, Cory Morowitz, that staffing levels at Trop AC a decade later were significantly lower than in 2007, showing that Wimar's staffing cuts in 2007 were insufficient and further cuts would be needed.[5] Mr. Morowitz further testified that Wimar did not cut too many employees in 2007; on the contrary, he said that "the labor reductions that [Wimar] implemented in Atlantic City were reasonable and required at the time and . . . Wimar w[as] ahead of their time in making those reductions in a lot of respects."[6]

As the Bankruptcy Court noted, Defendants had "presented testimony of the Trop AC casino managers and an expert opining that Trop AC was overstaffed at the time it was acquired and that, consequently, a reduction of staffing levels was necessary." Op. at 30. It therefore concluded, "[a]fter considering the evidence presented, . . . that the actions taken by the Defendants with respect to cutting staff were reasonable and not a violation of their Service Contracts." *Id.* at 33. In the Bankruptcy Court's words: "Defendants made a reasonable business judgment to cut

---

[4] *See* SA1184:16-18, SA1470:15-19.
[5] *See* SA1190:13-1191:16, SA1192:25-1193:6.
[6] SA1165:2-5.

staff to improve business performance, because the staffing levels at Trop AC were too high in comparison to other casinos in the industry." *Id.* at 33-34.

In this context, the Bankruptcy Court considered the so-called "cleanliness crisis" at Trop AC, which the CCC cited in denying Wimar a plenary license, including the CCC evidence relating to Defendants' alleged failure to keep Trop AC sufficiently clean. The Court also considered competing evidence from the Defendants that included substantial evidence of a local union's decision to "go to war" with Wimar in response to Wimar's staff cuts.[7] This evidence demonstrated the considerable political pressure the union brought to bear, along with the vandalism, property damage, and sick-outs the union implemented to achieve its stated goal of denying Wimar a casino license.[8] Based on this evidence, the

---

[7] SA1409:7-11 (local union opposed re-licensing of Trop AC); SA1414:4-11, SA1420:9-10, SA1421:10-1422:2, SA1423:3-6; SA1426:24-1427:3 (union president admitted he decided to "go to war" with Trop AC after the staffing cuts and even "hir[ed] a private investigator to basically go to the casino in New Jersey and try to find health violations and other evidence that could be used against the company").

[8] Adv. D.I. 335 (12/14/22 Hr'g Tr.) at 40:17-42:1, SA1215:24-12:16:7 (local union orchestrated employee callouts and sabotage to harm Trop AC and Wimar); SA774:6 (citing slowdowns and sabotage from local union); SA785:23-25, SA845:8-19, SA1288:3-6 (noting problems caused by union's decision to have a sick-out); SA845:8-19 (for a couple of months, most of the employees that were required to clean the casino called out sick); SA739:12-740:2, SA1486:23-1487:12 (cleanliness issue caused by employee callouts ended when they returned to work); SA1216:14-18, SA1370:16-19, SA1389:11-25 (acts of vandalism over six week period including vandalism to nonpublic—i.e., employee access only—areas of the casino; complaints to board of health later determined to be not credible); SA1217:3-6, SA1329:11-19 (union exerting pressure on regulators and participating in hearing).

Bankruptcy Court concluded that the record did not support Lightsway's claims:
"[T]he evidence presented on the cleanliness issue convinces the Court that the
problem was not caused by the reduction in cleaning staff but by actions of others to
destroy property and cause complaints to be made to the . . . CCC in retaliation for
staffing cuts." Op. at 35.

Considering the evidence before it, the Bankruptcy Court concluded "that the
Plaintiff has failed to establish that the Defendants are liable for a breach of the
Service Contracts or a breach of the implied covenant of good faith and fair
dealing." *Id.* at 36.

## 2.    The Damages Ruling

The Bankruptcy Court further considered whether Lightsway had met its
burden of proving damages as an alternative ruling:

> [T]he Court concludes that [Lightsway] has failed to establish that the
> Defendants are liable for a breach . . . . However, in the interest of
> efficiency in the event that a reviewing Court were to disagree with that
> conclusion, the Court will address whether [Lightsway] has met its
> burden of proving compensable damages are due from the Defendants.

*Id.* The Opinion outlines several fundamental problems with the damages evidence
presented by Lightsway at trial. The Bankruptcy Court noted, among other things,
that the evidence presented improperly failed to account for any other factors that
could have caused or contributed to the harm alleged, and instead improperly
assumed that Defendants' actions were the sole cause of the claimed injury. *Id.*

at 40-41. The Bankruptcy Court further noted that Lightsway's damages expert used an untested and improper methodology for calculating damages—i.e., a "debt pricing" model that this expert had not used previously, was not discussed or referenced in any treatise, and, to the expert's knowledge, had not been accepted by any court. Op. at 42-43. The Bankruptcy Court reasonably held that this model "was not an accepted methodology for calculating damages and was based on faulty assumptions, . . . it did not provide a proper basis for [an] opinion on damages." *Id.* Additionally, the Bankruptcy Court determined that Lightsway's damages evidence was improperly based on enterprise value and not lost profits. As the Bankruptcy Court noted in its Opinion, Lightsway's own damages expert conceded that the proper measure of damages in this case was lost profits, but he had instead performed a lost enterprise value analysis. *Id.* at 43-44. "[B]ecause the lost enterprise value analysis is not an appropriate method for determining damages where property is only temporarily impaired, as in this case, . . . it could not provide a proper basis for [the] opinion on damages." *Id.* at 44. The Opinion provides several other bases in support of its determination that Lightsway had not carried its burden at trial of establishing damages. *See id.* at 44-46.

Based on the totality of the evidence, the Bankruptcy Court concluded that the damages evidence and analysis Lightsway offered "was based on unreliable assumptions and not based on generally accepted methodologies," and, as a result,

"Plaintiff also failed to sustain its burden of proof on that element of its" claims. *Id.* at 47-48. On August 21, 2023, the Bankruptcy Court issued the Order on appeal.

### D. The Appeal

On August 31, 2023, Lightsway filed a timely notice of appeal. D.I. 1. The appeal is fully briefed. D.I. 18, 24, 30. No party requested oral argument.

## II. JURISDICTION AND STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees." 28 U.S.C. § 158(a)(1). The Order entering judgment in favor of the Defendants is a final order.

Defendants assert that "Lightsway does not challenge the Bankruptcy Court's factual findings on appeal. That is, Lightsway does not argue that judgment in Defendants' favor was contrary to the weight of the evidence, or that any of the factual findings the trial court made as finder of fact were contrary to or unsupported by the record." D.I. 24 at 2. Lightsway appears to agree that the appeal challenges no factual findings: "Each of the rulings on appeal present questions of law. The clearly erroneous standard does not apply to questions of law and there is no presumption of correctness." D.I. 18 at 5.

Whether issue preclusion applies is a question of law reviewed *de novo*. *See Home Depot USA, Inc. v. Lafarge N. Am., Inc.*, 59 F.4th 55, 61 (3d Cir. 2023).

## III.  DISCUSSION

Lightsway argues that the Bankruptcy Court (1) "improperly failed to apply the doctrine of issue preclusion" with respect to the CCC Opinion (D.I. 18 at 3); and (2) committed various errors in concluding that Lightsway did not prove its damages at trial (*id.* at 37-40; D.I. 30 at 10-11).

### A.    Issue Preclusion (Collateral Estoppel)

Lightsway argues that the Bankruptcy Court not only erred in not affording the CCC Opinion collateral estoppel effect, but also failed to understand Lightsway's argument that collateral estoppel should apply.  *Id.* at 33 (arguing that the Bankruptcy Court "avoided applying issue preclusion by mischaracterizing Plaintiff's argument").

As noted in the Opinion, "Plaintiff also argues that the Defendants are precluded from relitigating facts found by the CCC in its Opinion and Order denying the Trop AC casino license renewal."  Op. at 15.  The Bankruptcy Court rejected this argument:

> The Court concludes that the application of issue preclusion is not appropriate in this case.  The findings of the CCC were relevant to its determination that the actions of the Defendants warranted denial of the issuance of Trop AC's casino license.  The issue before this Court is a different one – whether the actions of the Defendants were a breach of the Service Contracts or the implied covenant of good faith and fair dealing.

*Id.* at 17 (footnotes omitted).  The Bankruptcy Court ruled that the issue in the CCC

13

proceeding (did Wimar meet its burden of showing by clear and convincing evidence that it was entitled to a casino license?) and the issue presented in the adversary proceeding (did Lightsway meet its burden of showing by a preponderance of the evidence that Defendants breached their contractual duties?) were fundamentally different, and that collateral estoppel therefore did not apply.

Lightsway's opening brief includes no discussion of the issues presented in the two proceedings, whether they were the same, whether those issues were actually litigated, or whether the issues were essential to the underlying judgments. Instead, Lightsway simply asserts, without analysis, that "Defendants may not relitigate specific factual and legal findings made by the CCC" and that "all the factual issues necessary for finding Defendants liable . . . must be resolved in favor of Plaintiff." D.I. 18 at 33.

For collateral estoppel to apply, it must be shown that "(1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) it was determined by a final and valid judgment; and (4) the determination was essential to that prior judgment." *Acceleration Bay LLC v. Activision Blizzard, Inc.*, 2022 WL 14760673, at *4 (D. Del. Oct. 25, 2022). The burden lies with Lightsway. *See Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) ("The party seeking to effectuate an estoppel has the burden of demonstrating the proprietary of its application.").

Here, as the Bankruptcy Court correctly found, the two proceedings addressed entirely different legal issues. Op. at 17 ("The issue before this Court is a different one" than that before the CCC.) While the CCC was tasked with determining whether Wimar had met its burden of establishing its entitlement to a plenary casino license, the Bankruptcy Court was required to determine whether Lightsway had proven the elements of its breach of contract and implied covenant claims. The Bankruptcy Court thus had to consider, for example, (1) whether the agreements at issue were valid and enforceable, (2) whether Wimar and CSC breached any of their duties under those agreements, and (3) whether any such breach proximately caused Lightsway's claimed damages. None of these issues came into play in the CCC proceedings, which addressed whether Wimar had satisfied the regulatory criteria for licensure. Indeed, the Service Contracts on which the claims tried by the Bankruptcy Court are predicated were merely tangential to the CCC proceedings; only the fact of the contracts' existence is mentioned in the CCC Opinion. This too compels the conclusion that the CCC Opinion should not have preclusive effect. Where, as here, an administrative agency's opinion "is devoid of any reference to the text of the agreement" between parties in a subsequent breach of contract action, that agency "did not decide the issue presented by the contract claim in" the trial court, and its conclusions do have preclusive effect in a subsequent contract action. *Crossroads Cogeneration Corp. v. Orange & Rockland Utilities, Inc.*, 159 F.3d 129,

15

139 (3d Cir. 1998).

Additionally, as Defendants correctly point out, for purposes of issue

preclusion, issues are not identical (and so issue preclusion does not apply) "if the

second action involves application of a different legal standard, even though the

factual setting of both suits may be the same." *B&B Hardware, Inc. v. Hargis*

*Indus., Inc.*, 575 U.S. 138, 154 (2015); *IOENGINE, LLC v. PayPal Holdings, Inc.*,

607 F. Supp. 3d 464, 488-89 (D. Del. 2022) (prior decision based on preponderance-

of-the-evidence standard could not be given collateral estoppel effect in subsequent

proceeding governed by clear-and-convincing standard); *In re Braen*, 900 F.2d 621,

624 (3d Cir. 1990) (different burdens of proof "foreclose application of the issue

preclusion doctrine"). Here, the difference in the standards of proof in the CCC

licensure proceeding (which required Wimar to meet its burden by clear and

convincing evidence) and in the Bankruptcy Court (where Lightsway had to satisfy

the preponderance of the evidence standard) also compels the conclusion that issue

preclusion does not apply.

Lightsway's additional arguments fail. Lightsway argues that "the findings of

fact of the CCC . . . established liability for breach of the Service Agreements and

the implied covenant of good faith and fair dealing." D.I. 18 at 29. But as

Defendants correctly argue, this puts the cart before the horse: unless issue

preclusion applies, "the findings of fact of the CCC" establish nothing as a matter of

law. That is, unless issue preclusion is found to apply, the findings of the CCC are nothing more than evidence—evidence that the Bankruptcy Court permitted Lightsway to present at trial, but which the Bankruptcy Court ultimately found unpersuasive and insufficient to support Lightsway's claims in light of the entire record.

Lightsway further argues that "[i]f the factual issues were different than those before the CCC, then there would have been no need [for the Bankruptcy Court] to disagree with the CCC's findings." D.I. 18 at 29. The CCC's findings (and evidence presented to the CCC) were properly addressed in the Opinion, as Lightsway relied exclusively on that evidence to try to prove its claims against Defendants at trial. The Bankruptcy Court "rejected" those findings (as Lightsway puts it) only in that it heard other evidence at trial—including the undisputed expert testimony of Defendants' liability expert, Cory Morowitz, as well as the testimony of Guy Michael, a former New Jersey casino regulator—and determined that, on balance, Lightsway had not carried its burden of showing that Defendants' actions were in breach of the Service Agreements or the covenant of good faith and fair dealing.

Important differences exist between these two proceedings, such as who bore the burden of proof, what had to be proven by the party bearing that burden, and by what standard it had to be shown. On account of these fundamental differences, and

as the Bankruptcy Court properly held, issue preclusion does not apply.

## B.    Damages

The Bankruptcy Court further determined that Lightsway did not prove its damages at trial.  Lightsway's challenge on appeal is not entirely clear, but it appears to argue that: (1) the Bankruptcy Court should not have reached the issue of damages at all (*see* D.I. 18 at 4 ("the Bankruptcy Court erred in considering the issue of damages")); (2) the Bankruptcy Court mistakenly concluded that there was no foundation for Lightsway's damages evidence (*see id.* at 3 ("The Bankruptcy Court compounded its error of law by using it as a basis to hold that Plaintiff's damages expert's opinion lack[ed] essential foundation")); and (3) the Bankruptcy Court erred in failing to apply the wrongdoer rule (*see id.* at 29 ("the Bankruptcy Court did not apply the wrongdoer rule in its damages analysis, which places the burden of the wrongdoer where the fact of economic harm was established but the exact amount is uncertain")).  These arguments are unavailing.

### 1.    Consideration of Damages Was Not Improper

Lightsway faults the Bankruptcy Court for analyzing Lightsway's damages evidence despite the Bankruptcy Court's finding that Lightsway had not carried its burden in establishing liability.  This argument is without merit.  The Bankruptcy Court made clear that it was addressing whether Lightsway had met its burden in proving damages "in the interest of efficiency in the event that a reviewing Court

were to disagree with" its conclusion that there is no liability. Op. at 36. The Bankruptcy Court thus provided a second, separate basis for its judgment in Defendants' favor—that, based on the evidence presented at trial and its evaluation of this evidence as trier of fact, Lightsway did not carry its burden as plaintiff in establishing damages. The ruling ensured that a retrial on damages would be unnecessary in the event an appellate tribunal reversed on liability.

> **2.    The Bankruptcy Court Properly Considered Lightsway's Evidence on Damages and Properly Found that Evidence Insufficient to Support Lightsway's Claims**

Lightsway claims that the Bankruptcy Court did not engage in substantive review of whether Lightsway had met its burden with respect to damages, and instead merely "concluded that Defendants could not have caused damages" as a result of its finding of no liability. D.I. 18 at 38. Contrary to Lightsway's characterization, the Bankruptcy Court's statement that Lightsway's damages evidence "lacked an essential foundation" merely states the context in which the Bankruptcy Court made this finding. Lightsway's argument further ignores the fact that the Opinion sets forth a detailed examination of the Lightsway's damages evidence and a thorough explanation as to why Lightsway had "failed to sustain its burden of proof" regarding same. Op. at 36-47. Indeed, the Opinion cites numerous bases on which the Bankruptcy Court found Lightsway's damages evidence insufficient, including that the evidence put forward by Lightsway:

improperly assumed that Defendants' actions were solely responsible for the claimed harm, failing to consider, account for, or exclude in their analysis other things that could have been the cause of the harm Lightsway claimed (*id.* at 40-41);

relied on an untested and improper methodology for calculating damages (*id.* at 42-43);

calculated damages based on lost enterprise value and not lost profits, where Lightsway's own damages expert conceded that lost profits was the proper measure of damages, and where there were no damages under a lost profits analysis (*id.* at 43-44);

improperly and repeatedly used 50-50 averages of different numbers in the damages calculations without explanation or justification for such weighting where the figures varied wildly (*id.* at 44-45);

looked at only three of the debtor properties, ignoring the remaining eight, which were not examined (*id.* at 45);

made "actual" calculations based on artificially "normalized" EBITDA figures which had been adjusted to reflect historical margins instead of actual margins without justification or explanation (*id.* at 45-46); and

relied on documents whose content and authenticity were demonstrably questionable (*id.* at 46-47).

Based on this detailed analysis, it is clear that the Bankruptcy Court's observation that the damages evidence presented "lacks an essential foundation," is not so much a separate basis to conclude that Lightsway had not carried its burden on damages as a description of the context in which the bases for this conclusion are set forth.

### 3.    The Wrongdoer Rule Does Not Apply

Lightsway argues that the Bankruptcy Court erred in failing to apply the "wrongdoer rule." D.I. 18 at 37-40. Defendants argue that the rule does not apply where liability has not been determined to exist and no economic harm has been found. D.I. 24 at 24. According to Lightsway, the Bankruptcy Court should have "assume[d] liability" but its "rationale and reasoning was circular." D.I. 30 at 10.

As Lightsway admits, however, the wrongdoer rule "only applies when liability is determined, including a finding that some economic harm occurred, although the amount is uncertain." D.I. 18 at 39. Indeed, it applies in situations, unlike this one, where a defendant has been found liable but the wrongdoer's conduct has made the plaintiff's claimed lost profits "speculative because they come from an uncertain world created by the wrongdoer." *Siga Techs., Inc. v. Pharmathene, Inc.*, 132 A.3d 1108, 1111 (Del. 2015). Under such facts, a plaintiff's estimate of the damages it has suffered can be sufficient to carry its burden. *Id.* The wrongdoer rule has no application here, however, where, among other things, there has been no finding that Defendants breached the contracts or that Lightsway suffered damages as a result. The Bankruptcy Court found just the opposite.

## IV.    CONCLUSION

I find no error in the Bankruptcy Court's determination that collateral estoppel did not apply or in its evaluation of Lightsway's evidence on damages.

21

The Court will issue a separate Order consistent with this Opinion.